Filed 1/22/26  In re K.R. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re K.R., a Person Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.R.,<br><br>Defendant and Appellant. | F089565<br><br>(Super. Ct. No. 24CEJ300157-2)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Fresno County.  Brian M. Arax, Judge.

Jenie S. Chang, under appointment by the Court of Appeal, for Defendant and Appellant.

Peter Wall, Interim County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

L.R., mother of minor, K.R., (mother) appeals from the juvenile court's dispositional order, arguing that jurisdictional findings found true pertaining to her were not supported by sufficient evidence.

The juvenile court sustained allegations under Welfare and Institutions Code[1] section 300, subdivisions (b) (failure to protect) and (d) (sexual abuse) pertaining to both parents due to sexual abuse by K.R.'s father, E.R. (father), and failure to protect by mother. The facts underlying the allegations resulted in a criminal conviction and incarceration of father, and K.R. was to remain in mother's care on family maintenance services.

Mother does not challenge jurisdiction being taken due to father's conduct nor the dispositional order for family maintenance services. She asks that we exercise our discretion to consider her potentially moot claims based on the stigma of the sustained allegations pertaining to her and any potentially adverse effects they may have in the future.

In reviewing mother's claims on their merits and finding no error, we affirm the juvenile court's jurisdictional and dispositional findings and orders.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 25, 2024, then 13-year-old K.R. disclosed to a peer that she had been sexually molested by father. A third-party adult who was aware of the disclosure informed mother and advised her to contact law enforcement and make father leave the home, but she did not do so. The following day, the third party reported the sexual abuse to the Fresno County Department of Social Services (department). The department requested law enforcement to do a welfare check.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

When law enforcement arrived at the family's home on August 26, 2024, K.R. confirmed to them that she had been molested three separate times in 2022. Father initially denied the allegations. Mother reported father had no history of sexual assault allegations, and she was completely surprised. She reported she confronted him when she learned of the allegations the previous day, and he said it only involved touching of K.R.'s thigh and was an " 'accident.' " Mother believed him because he had " 'fondled' " her in her sleep before. Law enforcement was unable to obtain an emergency protective order due to the age of the allegations, but father agreed to leave the home pending the investigation, and mother appeared protective at the time. Over the following few weeks, subsequent attempts to contact the family by the department and law enforcement were unsuccessful.

In September 2024, the investigating social worker learned that father was back in the home. On September 16, 2024, the social worker was able to contact the family at the home, and father was present. Father again denied the allegations. Mother reported she allowed father to come back to the home the day after law enforcement responded because they had been together for 19 years, and the family wanted to move forward. According to mother, K.R. wanted father back in the home, K.R. and father talked, and "everything was fine now." Mother admitted she was not present for the conversation and did not give a reason why but reported that K.R. was safe. She further reported that because of the family's schedule, K.R. and father were occasionally alone in the home together.

When the social worker tried to discuss a safety plan with mother, she responded she would do whatever she needed to " 'get you guys off my back,' " but neither father nor K.R. would be leaving the home. The social worker was concerned about mother's protective capacity and contacted law enforcement. Upon arrival of law enforcement, the parents advised they would not speak to them without a lawyer present. Mother,

3.

however, agreed not to allow unsupervised contact between father and K.R. The social worker attempted to interview K.R., but she declined to be interviewed at that time.

On September 17, 2024, law enforcement decided to place a protective hold on K.R. due to father being present in the home and mother's lack of protective capacity. When law enforcement and the social worker responded to K.R.'s school to place the hold, K.R. spoke to law enforcement and made consistent disclosures of the sexual abuse. K.R. said father had apologized in the past for what he had done and that after the third incident, father said he would never do it again. When asked if she believed father, K.R. responded, " '[A] little bit.' " K.R. disclosed that when she spoke to father after he returned to the home in August, father told her what could happen to him, but it was okay, and she did not have to keep secrets. He told her he would go to jail if she wanted him to, and it was her choice. This made K.R. feel guilty about father possibly getting in trouble.

Later that day, when the social worker was discussing the hold with the parents on the telephone, father made "out of the ordinary statements." He did not directly admit the sexual abuse but stated that he apologized to K.R. for what happened and that he sleepwalks and has woken up having sex with his wife. Mother added, " '[Y]eah, yeah, he sleepwalks.' " At one point when he was asked directly if he abused K.R., father asked mother, " '[S]hould I tell them the truth.' " There was a 16second pause, and no answer was given.

Law enforcement also spoke to the parents that day regarding the hold. When the detective asked mother about allowing father back into the home the day after law enforcement initially responded, she replied, " 'Yes, that happened two years ago' " and that K.R. had asked father to return. Mother said father made a " 'mistake.' " When asked if she was admitting the sexual abuse occurred, mother said she was not admitting anything and wanted a lawyer. She stated law enforcement did not understand their " 'family dynamic and how we are and what … had happened.' " Father said he believed

4.

that K.R. was telling the truth and suggested the abuse happened when he was sleepwalking, and it was not something he could control. The detective subsequently obtained a warrant for the parents' arrest.

On September 18, 2024, both parents were arrested on their way to a Child Family Teaming (CFT) meeting during a traffic stop. A hold was placed on K.R.'s then 14-year-old brother, L.R., due to no one being able to care for him at that time. After father's arrest, father shared that he met mother when he was 21 years old, and she was 16 years old, and because he loved mother, it did not matter to him that it was illegal.

Following the parents' arrest, K.R. told law enforcement that when mother found out about K.R.'s disclosure, mother asked her about it prior to law enforcement and department contact. K.R. said she provided "all the details" to mother, and mother told her she was going to call the police. That evening, when the police arrived, mother told K.R., " '[T]hey're here, I didn't call.' " It was noted mother had initially told law enforcement that she did not know the details, believed father, and stated it was " 'an accident.' " K.R. showed law enforcement text messages mother had sent her on the day of her removal that read, "CPS IS TRYING TO TAKE YOU" and "If anyone tries to take you or wants you to leave the school you have to fight them and not go at all you need to act like they are going to hurt or kill you and your only safe place is your home with your mom Dad and brother."

A juvenile dependency petition was filed on September 19, 2024, alleging K.R. came within the juvenile court's jurisdiction under section 300, subdivisions (b)(1) and (d).[2] The specific supporting facts alleged were as follows:

> "**Count b-1**   [Mother] has failed to provide adequate care, supervision and protection for her children, in that [mother] failed to protect K[.R.] from being sexually abused by [father]. [Mother] knew or

[2]   The petition also alleged that L.R. also came within the court's jurisdiction under section 300, subdivisions (b)(1) and (d), but the allegations as to him were later stricken.

reasonably should have known about the sexual abuse, as law enforcement advised her on August 27, 2024, not to allow [father] into the home until further investigation; however, [mother] allowed [father] to return to the home the next day. In addition, [mother] continues to allow K[.R.] and [father] to be alone, in which she allowed them to have a conversation regarding the abuse in private. K[.R.] disclosed [father] made her feel guilty for reporting what occurred. K[.R.] … [is] at substantial risk of suffering further sexual abuse, serious physical harm and/or neglect if left in … mother's care at this time.

"**Count b-2**   [Father] has failed to provide adequate care, supervision and protection for his child, in that [father] sexually abused K[.R.] On September 17, 2024, K[.R.] disclosed the sexual abuse by [father] consisted of, but not limited to, masturbating in front of K[.R.], oral copulation and inappropriate touching over and under the clothing, which began two years prior. K[.R.] is at substantial risk of suffering further sexual abuse, serious physical harm and/or neglect if left in her father's care at this time. [¶] . . . [¶]

"**Count d-1**   K[.R.] has been sexually abused by [father]. On September 17, 2024, K[.R.] disclosed the sexual abuse by [father] consisted of, but not limited to, masturbating in front of K[.R.], oral copulation and inappropriate touching over and under the clothing, which began two years prior. [¶] … [¶]

"**Count d-3**   K[.R. is] at substantial risk of suffering sexual abuse, in that [mother], failed to provide protection for K[.R.] from being sexually abused by [father]. On September 17, 2024, K[.R.] disclosed the sexual abuse by [father] consisted of, but not limited to, masturbating in front of K[.R.], oral copulation and inappropriate touching over and under the clothing, which began two years prior. [Mother] knew or reasonably should have known about the abuse, as she was told on August 27, 2024; however, [mother] allowed [father] to remain in the home and have unsupervised contact with the children placing them at further risk."

Mother apologized to the investigating social worker on September 19, 2024, for her prior behavior and understood she " 'messed up' " by allowing father back into the home. Mother said she was thinking about her family and not specifically her children in

making that decision.  Later that day, however, mother refused to allow social workers into her home to do a home visit at the direction of legal counsel.

At the continued detention hearing conducted on September 23, 2024, both children's counsel requested they be returned to mother's care in light of the representation that the parents were no longer an intact couple.  The juvenile court made temporary detention orders, gave the department discretion to progress visits, and continued the matter to September 30, 2024.

On September 24, 2024, mother allowed social workers to enter the home.  Mother stated she was wrong in her initial response and had come to realize what steps needed to be taken to keep the children safe.  Mother changed the locks to the home, removed father's belongings, and stated he would not be returning to the home.  She understood that additional steps might be necessary to protect the children such as obtaining custody and restraining orders.

At the continued detention hearing on September 30, 2024, the department was recommending the children be returned to mother and services be provided to her.  The juvenile court ordered the children returned to mother's care.  The juvenile court detained the children from father and set the matter for jurisdiction/ disposition.

On October 4, 2024, father pled no contest to a violation of Penal Code section 288.3, subdivision (a) after initially pleading not guilty to five felony counts and one misdemeanor count.  On November 1, 2024, father was sentenced to one year six months in prison and required to register as a sexual offender pursuant to Penal Code section 290.  A Criminal Protective Order (CPO) was served protecting K.R. from father. The department was later made aware father would be up for parole on June 18, 2025, and that his proposed conditions of parole included no contact with K.R.

The department was aware of possible past sexual abuse of K.R. by her brother, L.R., and that mother had indicated she knew about the children " 'experimenting.' "  In November 2024, the social worker addressed the issue with mother, and she described an

incident during which L.R. wanted to " 'see what [K.R.] had' " and showed her "what he had." L.R. touched K.R. " 'really quick,' " with no penetration. At the time, the parents had explained to the children the touching was inappropriate. Mother then became emotional after learning that the department heard the abuse may have occurred more than 10 times. Mother subsequently complied with the department's requests such as putting a lock on K.R.'s bedroom door and putting a camera in the hallway.

The department included in its jurisdiction/disposition report that the family had a previous child welfare referral from 2011 in Ventura County, where the reporting party alleged father had disclosed to them that he had sexually molested a child. The reporting party suspected the child was L.R. but did not have any evidence. The referral for sexual abuse was deemed "unfounded" and the referral for general neglect "inconclusive."

For jurisdiction/disposition, the department recommended that the court sustain the petition, adjudge K.R. a dependent of the court, and order her to remain placed with mother on family maintenance services. The department recommended father be denied services pursuant to section 361.5, subdivisions (b)(6) (severe sexual abuse), (b)(16) (required to register as a sex offender), and (e)(1) (incarcerated and services would be detrimental).

As of the writing of the department's jurisdiction/disposition report in December 2024, the parents were still reporting they were no longer an intact couple, and mother was employed fulltime and had stable housing and a support system. Both children reported they wanted their family back together and "whole again." K.R. was receiving mental health treatment. The department recommended the children could safely remain in mother's care, but she had not ameliorated the reasons that led to the department's intervention. The department opined court intervention was necessary because mother needed support while father faced criminal charges, and she further addressed the reasons why the department intervened. The department expressed concerns on whether mother would follow through with services.

8.

Mother contested the jurisdictional allegations pertaining to her. At the contested jurisdiction/disposition hearing on March 19, 2025, mother testified that when she found out about the sexual abuse allegations, she was in shock and did not understand what was happening. She allowed K.R. and father to speak after father was supposed to leave the home, "because they have a great relationship together." Mother continued, "[K.R.] loves her father very much. I—she told me she feels safe with her dad. She doesn't feel uncomfortable around him. He never made her feel uncomfortable ever again since the incident did happen two years ago. And I never saw anything that was suspicious or red-flagged."

Mother expressed remorse for not being protective initially by letting father back into the home and said she would never do that again in order to protect K.R. When father is released from prison, mother "would do whatever is necessary," including not allowing him to be around or have contact with the children.

The juvenile court asked mother if her testimony regarding K.R. and father having a great relationship arose from conversations after she learned of the abuse, to which mother answered in the affirmative.

Mother's counsel argued the court should only find the jurisdictional allegations pertaining to father true and find the allegations pertaining to mother not true because there was no evidence of current substantial risk of harm. Mother submitted on the recommendation of family maintenance as to disposition. Counsel for the department and counsel for K.R. asked that the recommendations be followed. Father objected to the recommendations without offering any evidence, while also noting he was in agreement with mother's position.

In ruling, the juvenile court noted it was "adopt[ing] the jurisdiction/disposition report and all its attachments, including the police reports in their entirety for their factual content" in terms of the specific sexual abuse allegations and mother's conduct following

K.R.'s disclosure. The court noted the facts were not in dispute, and that the issue was whether the children were currently at risk of harm in mother's care.

The court noted father's conduct was relevant in determining mother's risk of harm because it went to evaluating the "gravity of the risk," going on to say the gravity of the sexual abuse was "extreme" in that it occurred within "the most sacred relationship and trusted relationship to the child." The court stated it was not "discount[ing]" the distance of time between the abuse and disclosure and concluded there was no evidence to support that mother knew or should have known of the abuse prior to K.R.'s disclosure.

The juvenile court then turned its focus to mother's behavior following the disclosure, including that mother did not contact the police despite having been told full details by K.R.; was reluctant to cooperate with law enforcement; was present when father made "extraordinarily suspicious [statements] essentially acknowledging what has transpired"; made statements defending father; and allowed K.R. to be alone with father.

The juvenile court also commented on mother's testimony that she allowed K.R. to be alone with father after hearing of the allegations because they had a "great relationship," stating, "That may be true, but how do you judge that against the sexual assault victim of this nature, great relationship or no. That's not good judgment and it seems to be repeated here today as grounds for judging it differently than I'm describing." The court went on to say it appeared mother was inappropriately placing responsibility on K.R. that should have been on mother.

The juvenile court went on to state it "acknowledge[d] that additional time has passed," but in evaluating the probability of future harm, the court explained: "We haven't had that experience of demonstrating protective capacity while father has the opportunity for contact." The court acknowledged the "likelihood" of the parents getting back together might be low and in the context of a small incident, "it would probably not be a very big deal," but in the case of a "large and explosive incident, the smallest risk

presents once more the gravity that we're talking about." The court went on to state it was its role to determine "what is the level of risk, what is the gravity of the conduct, and how that projects into the future. And when I do that analysis, the smallest risk becomes very large."

The juvenile court found the jurisdictional allegations were proven by the preponderance of the evidence standard and adjudged K.R. a dependent but found there was not clear and convincing evidence to support removal from mother's custody. The court ordered family maintenance services for mother. The court ordered father not to receive family maintenance services pursuant to section 361.5, subdivision (b)(6) [severe sexual abuse and services would not benefit child].

## DISCUSSION

### I.    Mootness and Discretion to Consider Mother's Claims

Mother acknowledges that if we credit her arguments and reverse the jurisdictional findings pertaining to her, the juvenile court would still retain jurisdiction over K.R. due to unchallenged sustained jurisdictional allegations pertaining to father. Recognizing her claims may be moot, she asks this court to exercise our discretion to consider her claims for several reasons, including the stigma of such allegations, potentially adverse effects on future dependency cases, and/or possible inclusion in the Child Abuse Central Index (CACI).[3] The department does not address the justiciability of mother's claims and only addresses them on their merits.

---

[3]    There is no evidence in the record that mother was reported for inclusion in the CACI, nor does any party on appeal assert that she was or that her conduct is indisputably reportable (see *In re S.R.* (2025) 18 Cal.5th 1042, 1142). While the issue is not before us in this appeal, we note for the parties' benefit it is not apparent to us based on the facts of this case that the allegations pertaining to mother would require a report to CACI, as there is no evidence she personally sexually abused K.R. We remind the parties that the parameters of what conduct necessitates reporting for inclusion in the CACI is not defined by section 300 but by specific provisions in the Child Abuse and Neglect Reporting Act (CANRA) in section 11164 et seq. of the Penal Code. Under CANRA, only substantiated reports of "child abuse or severe neglect" are to be reported. (Pen.

11.

"[W]here jurisdictional findings have been made as to both parents but only one parent brings a challenge, the appeal may be rendered moot." (*In re D.P.* (2023) 14 Cal.5th 266, 283.) Appellate courts retain discretion to review challenges to jurisdictional allegations even when they might be moot. Courts may consider several factors in determining whether to exercise this discretion, including "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,'… ' "could have other consequences for [the appellant], beyond jurisdiction," ' " or "is based on particularly pernicious or stigmatizing conduct." (*Id.* at pp. 285–286.)

Due to any potential effects beyond jurisdiction the sustained allegations may have on mother, we will exercise our discretion to consider her claims.

## II. Sufficiency of the Evidence

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Code, § 11169, subd. (a).) "Child abuse" includes the term "sexual abuse," which is defined by Penal Code, section 11165.1 and does not appear to include acts that put a child at *risk* of sexual abuse, only acts that constitute abuse in and of themselves. Its placement in the Penal Code "supports an inference that it was aimed at criminal conduct." (*Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 89; see *In re S.R.*, *supra*, 18 Cal.5th at p. 1144 ["the criteria for a CACI listing based on 'child abuse or severe neglect' under CANRA generally appear to be narrower than the grounds of juvenile dependency jurisdiction under Welfare and Institutions Code section 300".)

A child may be adjudged a dependent of the court under section 300, subdivision (d), if (1) "[t]he child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household" or (2) "the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse." (§ 300, subd. (d).)

In the present case, the court expressly found mother did not know nor reasonably should have known that father was sexually abusing K.R. prior to her disclosure, a finding we will not disturb on appeal. It is also undisputed that mother did not personally sexually abuse K.R. The only question then is whether the evidence supported "there is a substantial risk that the child will be sexually abused … by his or her parent or guardian or a member of his or her household" to support the section 300, subdivision (d) allegation pertaining to mother. We conclude substantial evidence supports the juvenile court's finding that such a risk existed.

"Although 'the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm' [citation], the court may nevertheless consider past events when determining whether a child presently needs the juvenile court's protection." (*In re T.V.* (2013) 217 Cal.App.4th 126, 133.) "A parent's past conduct is a good predictor of future behavior. [Citation.] 'Facts supporting allegations that a child is one described by section 300 are cumulative.' [Citation.] Thus, the court 'must consider all the circumstances affecting the child, wherever they occur.' " (*In re T.V.*, at p. 133.)

Additionally, as the juvenile court pointed out in its analysis, in evaluating "substantial risk" of harm, we look not only to the probability of the harm but the magnitude of harm. (See *In re I.J.*, *supra*, 56 Cal.4th at p. 778 [" 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the

13.

harm is potentially great…. [¶] … [¶] … Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm ….' "].)

Here, the court could reasonably conclude K.R. was at "substantial risk" of sexual abuse at the time it made its jurisdictional findings. Mother showed minimal to no protective capacity against sexual abuse from the time she learned of K.R.'s disclosure around August 25, 2024, until September 24, 2024, when she started fully cooperating with the department.[4] According to K.R., during this time period, mother was aware of the egregious details of the abuse, and the record supports a strong inference that mother also knew the undisputed truth of the allegations as evidenced by her presence while father made incriminating statements. She nonetheless defended father's actions, was not forthcoming with law enforcement, was uncooperative with the department, and refused to keep father and K.R. apart or take protective measures. This was particularly concerning and dangerous conduct given that father severely abused K.R. multiple times, and mother witnessed father suggesting he had no control over his abusive actions and may have done them while sleeping. It is noteworthy that mother did not become cooperative or prove her ability to be protective for return of the children until after father was incarcerated and therefore physically unable to have contact with K.R.[5]

---

[4] On appeal, mother frames her neglectful act as "allowing a single unsupervised meeting" and argues that act was insufficient to support a finding that K.R. was at risk of sexual abuse, given mother's subsequent efforts to be protective. The record belies this assertion. Mother not only allowed father to return to the home for one meeting after learning of the abuse, she allowed him to live in the home for a few weeks, while avoiding contact with the department and law enforcement. Mother admitted there were times he and K.R. would have been alone together due to the family's schedules over those weeks.

[5] It appears father remained in custody in the period of time between his arrest on September 18, 2024, and sentencing on November 1, 2024.

Father's sexual abuse of K.R., and mother's conduct in the month that followed her learning of the abuse, posed a risk of harm to K.R. that was great in magnitude. The risk of further similar harm was reduced by father's incarceration and mother's protective actions since, such as changing the locks, removing father's belongings, and taking additional actions to protect K.R. from any abuse by her brother. However, the risk was not eliminated. Father's sentence was relatively short, and he and mother had been in a relationship for over 19 years. Additionally, mother's comments at the jurisdiction/ disposition hearing regarding father and K.R. having a "great relationship" displayed a lack of insight into the negative effects the sexual abuse had on K.R. and an inclination towards placing the burden of deciding whether there should be contact and assessing risk onto K.R. We note not long before the hearing, both children had made statements that they wanted their family to be "whole again," and there is evidence on the record of K.R. wanting visits with father despite the CPO in place. Though we recognize there would be legal protections in place such as parole conditions, it is unclear whether mother would allow contact and to what extent if K.R. asked for it upon father's release. The juvenile court was not required to accept mother's assertion that she would not allow contact, especially given her other statements and her past conduct.

In evaluating the totality of the circumstances, while the probability of future sexual abuse of K.R. might be relatively low, given the record, there was still a reasonable possibility of future abuse. Weighed against the great magnitude or gravity of the harm already caused and the risk mother posed at the outset of the proceedings, the juvenile court's determination that the risk of future sexual abuse was "substantial" and still existed despite the passage of time was reasonable and supported by the evidence.

The above also supports the section 300, subdivision (b)(1) allegation pertaining to mother. Under section 300, subdivision (b)(1), jurisdiction is proper where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" "[t]he failure or inability of the child's parent … to adequately

supervise or protect the child" or "[t]he willful or negligent failure of the child's parent … to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." For the reasons we have stated above, the juvenile court was reasonable in determining mother's actions put K.R. at substantial risk of serious physical harm, i.e., sexual abuse.

We want to make clear we do not believe the record supports a finding that mother personally sexually abused K.R., nor that there was a risk she would personally sexually abuse K.R., and we do not intend this opinion to be construed to support a contrary view. The record does, however, support that mother put K.R. at substantial risk of being sexually abused by father.

For the foregoing reasons, we conclude the jurisdictional findings pertaining to mother under section 300, subdivisions (d) and (b)(1) were supported by substantial evidence.

## DISPOSITION

The juvenile court's jurisdictional and dispositional findings and orders are affirmed.


DESANTOS, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.


16.